Judge Pryor, Judge Kidd, and I are pleased to welcome you to our panel sitting here in Atlanta. We have four cases today. I think you're all familiar with our traffic light system. If you're not, once the yellow light goes on, that means that your time is drawing to a close, so begin to wrap up. If we take you beyond the red light, just keep on going. You'll be on our time and not yours. And with that, we're ready for our first case, number 23-13946, United States v. Andres Alvarado. Ms. Saunders. And before you begin, I want to acknowledge your court appointment. We want to thank you very, very much on behalf of the court and Mr. Alvarado, too, for your service. We really appreciate it. Thank you, Your Honor. May it please the court, Hallie Saunders, on behalf of Andres Alvarado. Mr. Alvarado was picked up off a boat in the Caribbean and dropped into the U.S. criminal justice system. As though criminal defendants aren't lost enough in a proceeding, Mr. Alvarado is a Colombian national and doesn't speak English. Two errors resulted. First, without informing Mr. Alvarado of all his rights under Rule 11, the government entered into a plea agreement and the district court accepted a guilty plea for Mr. Alvarado. That was plain error. The government has conceded as much. Notwithstanding this concession, the government now attempts to argue that it didn't matter. But there's a clear immigration consequence from Mr. Alvarado's plea. And Mr. Alvarado cooperated with the government during his prosecution, cooperation that led to death threats from his associates back home. There's a reasonable probability, and the record clearly shows that probability, that Mr. Alvarado would not have pled guilty had he understood that he would be deported at the end of his sentence. Accordingly, this court should vacate his plea agreement as not knowing involuntary and remand. I have a question about the record before we get too far into this. Where was your client living before this offense? The government says that he was in Colombia, but there's information in the record suggesting he may have been in Venezuela. Yes, I don't know that it's clear from the record exactly where he was living. He had been in Colombia and then fled at one point to Venezuela because of threats from his prior conviction. I don't know exactly which of those he was in before his arrest. What's the relevance of his having fled to Venezuela in your view? I think that it shows that he is willing to go to lengths to get away from threats. It underscores how serious the threats against his life are and how dire the circumstances are if he is deported, having cooperated and having those threats against him again. He was willing to flee once before and I think that's evidence that he would not have entered into a guilty plea and taken on those same threats and same risks knowing that he'd be returned again to Colombia. Does the record indicate when he began cooperating with the government? Was it before the plea or after the plea? The record doesn't show exactly when he began cooperating, but at the very latest I think it was at the time he signed the plea agreement. The plea agreement contains in it requirements that he cooperate and continue cooperating once he's begun. So by the time he signed that agreement, he had agreed to cooperate and had entered into this contract that would require him to continue cooperating and then that was public and could be seen as his cooperation. Does that cut against your, not the error or the plainness of the error, but against harm? In other words, if he began, he's been through this sort of thing before in one sense, right? Yes. Right, and so if he starts cooperating before or anticipates cooperating before the change of plea hearing, how likely is it that the failure of the district court to tell him about immigration consequences would have changed his outlook and his decision to enter a guilty plea? I think, Your Honor, maybe a couple points on that, but at the very latest, so I guess there's two ways to think about why he would have changed his plea had he been deported. And the first is that you have this plea agreement and at the point in time when he officially agreed to waive his right to go to trial, it was clear that he'd be cooperating, even if there was some cooperation outside of that that maybe had reached its way home, he might have decided at that point to go to trial to try to cover his tracks or make the cooperation seem less egregious once he knew he was going to be deported. So whether or not he cooperated before the plea agreement, there was still a decision he could have made to go to trial and mitigate any effects of that cooperation and threats that came from it. But I think either way, that gives you a reasonable probability he would have pled differently. And Your Honor mentioned that he's been through this before. I don't think that that affects the analysis either. The fact that he had been pled guilty before and been deported before has nothing to do with this case, because in this case he was cooperating. There were reasons to believe that he might have been able to stay in the United States. And so whether or not he was cooperating before or after the plea agreement, all of that could have factored into his decision to sign that agreement. Well, I'm not sure that it's completely irrelevant because the last so-called prong of the plain error analysis requires us to decide as a discretionary matter whether we need to correct the error. And he had to know that he faced the prospect of removal having been removed once before for a slightly different narcotics offense. I don't think that's right for maybe three reasons, Your Honor. So first, he was deported after his first sentence concluded, but there's no reason for him to know that that was because of his conviction. So the issue here is he's going to be deported either way because he has this prior particularly serious crime on his record. But he was in the country. He didn't have legal status in the country, right? Yes. And so he may have thought that that's why he was going to be deported. That's why he was deported the first time. That means that this time around, he may well have thought because he was cooperating with the government, things would be different. He's helping the government. He's informing on people in his home country. That suggests maybe he thought he could have stayed. He might have thought he could apply for asylum, something like that, as part of his cooperation. At the sentencing hearing, Mr. Alvarado's counsel made the comment that they were cooperating with an eye toward the government maybe applying for resentencing down the line, which suggests, too, that Mr. Alvarado might have thought that there were additional benefits that could have come from his cooperation after he signed a plea agreement going forward. Had he known at the outset that staying in the country was not one of those options, there's reason to believe he would have chosen not to go inform on people that then he'd have to go face back home. And that gets to the Pryor fleeing from Columbia that Judge Pryor asked about. There was all sorts of reason to believe that those were legitimate threats that he was afraid of. Can you address the second error? Yes, Your Honor. So the district court erred there by failing to confirm that Mr. Alvarado had read and discussed the PSR with counsel. That is something that he had to review, not just his counsel. So there was plain error here because there was nothing that happened at sentencing hearing, none of the objections that were raised about the PSR that shows that Mr. Alvarado reviewed it, read it. At best, it shows that his lawyer talked to him and knew him and that his lawyer had read the PSR, but that's insufficient under the rule, which requires the defendant to have read it. So there was error there. Then the question is if that affected his substantial rights. And we think this court should adopt the Sixth Circuit approach in Mitchell and hold that there's a presumption of prejudice when the defendant has not seen the PSR at all that that has infringed on his substantial rights, impaired them, because he doesn't have the ability to then effectively allocute. He doesn't have the ability to raise objections to any factual inaccuracies that then can be held against him when he's being sentenced. We have unpublished cases requiring a showing of prejudice for this type of error. Of course, they're not binding as unpublished decisions, but why aren't they persuasive? Why shouldn't we follow that route here? Yeah, I think there's a couple responses to that, Your Honor. For one, these are almost drive-by rulings in the sense that in a number of these, like Lewis and Palma, the defendant also raised objections to the PSR. The court wasn't squarely faced with a presumption of prejudice or not. And so then the court ruled and said, well, those errors that you pointed out didn't prejudice you and ruled that way. That's not the same as ruling that there is no presumption, but rather taking a different argument that the defendant had made. Also, in three of the cases that the government cites of those unpublished judgments, the court found that there was no error, that the defendant hadn't argued that he had never seen the PSR, that the court hadn't confirmed that. Here, Mr. Alvarado never saw the PSR. If the defendant has seen the PSR and then fails to raise some objections, I think it's easier for the court to say, we can assess this prejudice and see that we didn't raise things. But when the defendant has never seen the PSR, then we end up in that right of allocation land where it's hard, if not impossible, to figure out the exact prejudice from not letting the defendant see the PSR because they're never able to identify the kinds of factual inaccuracies that the court needs to assess when issuing a sentence. But, you know, sometimes, not all the time, but sometimes prejudice is presumed when you can't recreate the past and you have no idea how things would have turned out had a right been recognized and honored. But here, I'm not sure we have that same scenario. Maybe my thinking is not the right one, but let me tell you what it is anyways. Here, you've got the pre-sentence investigation report. He now has counsel who is asserting a plain error on the part of the district court, and there is plenty of time and opportunity to point out some things which are at least allegedly inaccurate or wrong in the pre-sentence investigation report that, if given the chance, he could contest or bring the district court's attention to. But nothing like that has been identified here. So if the pre-sentence investigation report, for example, was pristine, where's the harm? So, Your Honor, I think the way that you're thinking about it works if each of these are very independent steps or independent sections of a sentencing. But the reason why it's not enough for the defendant after the fact on an appeal to be able to identify things is that the PSR really gets to this allocution, the right and the ability of the defendant to stand up and plead for leniency. The defendant has a right to know what the sentencing court has been told about him before he gets up to do that. And so it's not just about the PSR and raising objections. Rule 32 has a separate prong which requires the district court to respond to objections. So there's one component, which is the information there. But then you have this allocution right, which goes way back, way back. The defendant can stand up and plead for leniency, and he can't do that as effectively if he doesn't know what the district court knows about him. It's like bringing him in partway through the sentencing. He doesn't know what's happened beforehand, but just has to stand up and talk to the judge. So in that sense, I think that this Rule 32 error dovetails with the allocution to say that you can't figure out exactly what would have happened initially in the sentencing hearing because the allocution, which this court and others have held, can't assess that prejudice near as well, is part of that Rule 32 error. So we would ask the court to adopt that standard, which isn't inconsistent with things the court has held before, and vacate the sentence and remand. Now, again, I'll note that if the court decides on the first error, the Rule 11 error, it doesn't have to reach the Rule 32 error. Thank you. All right. Thank you very much. Mr. Gray. Good morning, and may it please the court. Scott Gray for the United States. Plain error sets a demanding standard for the review of unpreserved claims. That burden is dispositive of Alvarado's appeal. Turning first to the plea issue, Judge Pryor asked about the defendant's history in terms of where he had lived. In the pre-sentence report on page 9, there's mention of his ties to Colombia. And then, as Judge Pryor noted on page 10, as the pre-sentence report discusses his work history, there's an indication that he reported that he had moved to Venezuela in part to escape concerns about cartel-related violence, and that was why he left prior employment in Colombia. Judge Pryor also asked about the import of that factual matter, and the import is that it suggests that Alvarado had concerns about his safety with the cartel before he ever came to the United States. And that suggests that these concerns already existed, so it was not something unique brought about by his plea. And as my friend noted, Alvarado was caught in a distinctive fashion. He was apprehended in international waters off the coast of Venezuela. He was in a vessel that was marked or claimed a registry in Trinidad and Tobago. So he was not someone like the lawful permanent resident in Lee with long-standing ties to the United States. He had no expectancy to be in the United States because he was brought to the United States specifically for the purposes of prosecution. At no point did Alvarado indicate that he had any expectation of remaining in the United States, and he had no probability of facing a better outcome here, because if he had ultimately proceeded to trial, if he had pursued the long-shot strategy and obtained an acquittal, he simply would have been removed from the United States in quicker fashion. But if he had been told about the possible adverse immigration consequences at the change of plea hearing, he might have tried to explain that he didn't want to go through with the change of plea if the government wasn't going to promise that it was going to try to keep him here on some sort of basis after cooperation. Every once in a blue moon, the government does do that. Certainly, Your Honor. And we do have to speculate to some extent about what would have happened there, but we would submit that the allocution exchange at sentencing is a pretty good indicator where the district court stated right before the allocution that he would likely be deported, such that he would not be on release. And while Alvarado expressed concerns about his safety when he returned to Columbia, he never expressed confusion about the plea, a desire to get out of the plea, or any request to withdraw the plea. Instead, he began his comments with an expression of regret at being found in the United States again, and he made several entreaties that he would continue to cooperate. And for good measure, any likelihood that Alvarado had at remaining in the United States for a longer period of time likely would have hinged on his cooperation. Therefore, Alvarado actually acted in accord with a proper understanding of his guilty plea. Also, it bears note that this court presumes that counsel provided appropriate warnings in accord with the Sixth Amendment. The record is silent about what counsel did or didn't say at this stage, but that simply indicates that a direct appeal is the improper vehicle to decide this sort of issue. Lee and Padilla, the cases that Alvarado relies upon, were Sixth Amendment cases grounded in the right to counsel, and here there's actually essentially a set of redundancies. One redundancy is counsel's warnings to a client, and then the other is the procedural warning under Rule 11B10 that's at issue here. At this stage on direct appeal, this court should say that there was no prejudice. Unless the court has further questions about the plea, I'll turn to the counsel. No, let's keep talking about the plea for a second. What about the sort of possibilities that Ms. Saunders referred to, things that might have happened had the district court advised him about the adverse immigration consequences? What's your response there? My response is ultimately that the defendant had no expectation to remain in the United States, and that's clear from every facet of the record, so the court can make an educated guess. My second line response... That means that it's never plain error, reversible plain error, for a non-citizen to claim that the district court didn't advise him or her of immigration consequences because that person would never have an expectation of remaining in the country? I think it rarely would be procedurally because of the way the record would develop. If a defendant started to express concerns about the plea and is looking back and forth to counsel, and that's reflected in the record, and the defendant starts to make statements of saying, wait, I didn't understand when I pleaded guilty that this is where we would be today. Under this argument, though, that you're making, that advice of counsel or the presence of counsel and a defendant is consulting with counsel, it seems like you're essentially arguing that there should never be plain error for any violation of the federal rules because counsel is always there in these proceedings. Is that your position? Not at all, Your Honor. It's when there is an affirmative statement in the record that demonstrates that there is confusion, that there is a misunderstanding, and the district court doesn't then step in and correct it. And we would submit that those instances would be extremely rare because when that concern becomes clear on the face of the proceeding, most district judges are going to say, hold on, let's stop the presses, let's slow down and make sure that everyone understands what's going on. It's possible to imagine a circumstance where, for one reason or another, that doesn't occur, and in that case, we would be talking about prejudicial plain error. But at this stage, this Court's precedents also are clear that it is not going to read into the cold record an assumption of prejudice. It's going to look for that clarity on the face of the record. If the record is silent, then the party with the burden, which is in this case is Mr. Alvarado, ultimately loses. Now, as I suggested, he's not totally without recourse. As Lee demonstrates, a defendant, if he has the facts to support post-conviction relief under Section 2255, can proceed with the potential development of that argument. But that ultimately is a separate step in the proceedings. That's a different stage in the analysis. Here on direct appeal, when the record is silent, this Court shouldn't assume into the cold record facts that would create essentially a presumption of prejudice. Here's what I think is their best argument, speaking only for myself. Because of the seriousness of these threats, in the past he fled to Venezuela. So we know that there were real threats that he was afraid of, essentially death threats. So how could the threat of death not have made a difference to him if he knew that he was likely to be removed to the very place where these people were? Because the pertinent question here ultimately isn't whether he might go back or whether he was afraid of that fact. I would agree with you that there certainly is evidence that he was afraid of his return. What's missing here is an expectancy that he believed that he could avoid that outcome by any mechanism. Ultimately, Alvarado was going to go back where he originally was from because he was brought to the United States for the purpose of his prosecution. He wasn't like a lawful permanent resident. He wasn't someone who had years of experience in this country who'd built up familial and professional relationships in the United States. His only connection, his only meaningful connection to the United States was his prosecution in this case. Is there anything in the record that would allow us, that you can point to, that shows that the government took the potential ability for his to remain in the country off the table? Your Honor, I think the record simply is silent on that point. There's no discussion of which I'm aware in the record that says one thing or the other about any potential immigration relief or anything. So then when you say that he was going to be removed, that in itself is speculating, your speculation. It is, we would submit the reasonable interpretation of this record absent some sort of potential cooperation, and I want to be very careful as I from the record, but the reasonable expectation of someone brought to the United States for purposes of prosecution, that individual is not going to have a valid claim than to remain in the United States. Insofar as there are questions about what the record would say on that fact, it simply reinforces our second line argument that the proper recourse would be a post-conviction matter where those sorts of facts, insofar as they are appropriate, could be developed and not a direct appeal where ultimately there needs to be something clear and unambiguous on the face of the record that demonstrates prejudice. Something... No, go ahead, finish, finish. Something where the district court should have said, we're going to stop everything and fix this matter, and when the district court didn't do that, that was reversible error on the district court's part. Did the pre-sentence investigation reports say anything about removal possibilities? Do you recall? My recollection of it is that its discussion of removal was tied to the defendant's prior proceeding, namely that he had been removed after his prior drug conviction in Puerto Rico. But it didn't say that removal was going to be a likely consequence of this offense? I don't recall a discussion in the record about removal until the district court referenced his removal before the defendant's allocution. I think that's on page 6 of the sentencing transcript. It's right before the defendant allocutes. And so it certainly was clear to the defendant at that time, and as we've noted, while the defendant expressed concerns about his safety, he didn't express any expectancy that he would remain in the United States. And while I'm happy to address any further questions about that point, I would turn to the sentencing issue and would note at the starting line, this court may dismiss the sentencing issue because it falls within the scope of the appellate waiver. While the defendant has raised the Supreme Court's decision in Hunter, that case is different because it touches on a constitutional issue at sentencing. This ultimately is a procedural one. And so I do want to make clear our first-line argument is that dismissal remains appropriate here, and there's been no argument that the waiver wouldn't apply under current precedent. But to address the merits of the issue, first, when this court looks at the first two elements of plain error, the United States' position is that a functional approach is sufficient to ensure or to verify, as the rule puts it, that the defendant has had an opportunity to review the presentence report. Certainly there was no question here, but this court said in Aleman and footnote 6 that that's not required, that there isn't a magic words requirement. Here, the defendant did acknowledge through counsel that he was ready to proceed. There was extensive discussion about the calculations in the presentence report, and this court should accept a functional-layer approach instead of a formalistic one that requires a defendant to read line by line. Rule 32I1A is designed— You're saying that in terms of whether or not there was error or whether or not there was harm to him flowing from the error? Yes, Your Honor. Our first position is that the record is sufficient here to verify that the But it's completely silent on that point. There is no question, but given the nature of the proceeding itself and given defense counsel's representation that the defendant was ready to proceed, this court may draw that inference from defense counsel's acknowledgment. But that means that we're going to be encouraging slipshod sentencing hearings because almost every judge I know—and I was one at some prior time in my life—says to the lawyers, you know, Mr. Gray, are you ready? Ms. Saunders, are you ready? And they both said, yes, Your Honor, ready to proceed. If that is licensed to just go forward without going through the other procedural steps that a district court is required to follow, we're encouraging not the best practices. I would agree with Your Honor that the best practice would be for the district court to have asked the question whether they had reviewed the report. We simply would ask either way that that be sufficient, that there not be a requirement verbatim to assume that the defendant must read it line by line. But there's no—but you're assuming that he read part of it. There's no indication he read any of it. That's the problem. There's no direct indication that he did or that he didn't. Correct. So it's the district court's obligation to do what the federal rules of criminal procedure require, which is to ask and verify that that was done. It is ultimately the district court's job to verify. And here, given the extended discussion about the pre-sentence report calculations, without any sort of confusion, that was sufficient for the district court to verify in this case. If it was not, and if the court says that it was not, then there was no prejudice here, and this court should not presume prejudice. Pre-sentence reports have little bearing to allocutions, and this court made clear in Doyle that allocution is the exception to the rule. It is not an exception that it's, in and of itself, creating a new class of errors where prejudice is presumed. Here, the pre-sentence report is a written document. Its contents are known. The district court's reasons for the sentence are stated at sentencing and are known, and this court can assess prejudice on that record. And with that, I do note that my time is drawing to a close. While I'm happy to entertain any further questions, we would ask that this court affirm. Thank you for your, thank you for time this morning. Thank you very much. Ms. Saunders, the question I asked Mr. Gray, did the pre-sentence investigation report say anything about the possibility or requirement of removal? No, Your Honor. It only came up, as my friend said, at the sentencing hearing when the judge mentioned it, and immediately following that, Mr. Alvarado expressed his fear of going home because of his cooperation. And I'll also note, my friend made the comment that there was nothing evidence that the threats here were because of this case, that they might have been from prior cases, but that's not true. At the sentencing hearing, Mr. Alvarado explained it was because of his cooperation in this case that he was getting threats. It wasn't from the previous Columbia threats. Now, two responses on the Rule 11 issue. The government puts a lot of emphasis on it being the requirement of a defendant who doesn't speak English, who's doing all of this through a translator, to speak up and say something at either the plea hearing or the sentencing hearing. Like, I didn't sign on to this, or wait, I wonder about this. But that doesn't happen. The defendant goes into this hearing. He's reached an agreement with the government. The government has made clear that they can pull that plea agreement at any moment. I don't think it's realistic to try to expect a defendant at a plea hearing or at a sentencing hearing where he's pleading for leniency to speak up, especially while counsel is speaking, to chime in and say, wait, that's not what I thought. I don't think that that can be the standard. And so the government's emphasis that without that in the record, there isn't evidence this court can go off, can't be the rule there. I also think the government's point that Mr. Alvarado is going to be deported anyway, he kept saying that there was no indication in the record that there was a reasonable expectation he could stay in the country. I think that's true of anyone who's ever come to the country and claimed asylum. That can't quite be the standard, that there was no expectation you can stay in the country because you don't have lawful status. We have ways to give people status here that come and then show they have a reason for it. Cooperating with the government, especially when that brings about threats to your safety to help out the U.S. government, is one of those reasons that I think there is a reasonable expectation he could have stayed. Or at least he had that because there's no way for him to have known he would have been deported. On the Rule 32 error question, yes, the district court didn't have to ask. The best practice is to ask. This court has allowed the district court that not asking isn't grounds immediately to reverse, but there has to be some indication in the record. It's not just best practice, but it's fine if you don't do anything. And there was nothing in this record that shows that Mr. Alvarado read the PSR. The defendant's counsel acknowledging that they're ready to go, which can't be the case or else none of those rules matter. And none of the objections, as we say in the brief, none of the objections that defense counsel raised show that Mr. Alvarado had anything to do with them. They're all generic legal objections to the offense-level safety valve application. So we'd ask that the court vacate the plea agreement or the sentencing if it reaches that. Thank you. All right. Thank you both very much. Thank you. All right, our second